UNITED STATES of America

v.

**Javier SIERRA and Reynaldo Ojito.**

Cr. No. 83–284.

United States District Court,
D. New Jersey.

May 7, 1984.

W. Hunt Dumont, U.S. Atty. by Marianne Espinosa Murphy, Asst. U.S. Atty., Newark, N. J., for the U.S.

David S. Zapp, Leonia, N. J., for Javier Sierra.

Lawrence Dubin, Goldberger, Feldman, Dubin & Weisenfeld, P.C., New York City, for Reynaldo Ojito.

OPINION

BROTMAN, District Judge.

█ This case once again raises a troublesome issue regarding the Fourth Amendment's particularity requirement for search warrants. In *United States v. Perez*, 562 F.Supp. 574 (D.N.J.1982), this court found that a search warrant which authorized the seizure of "controlled dangerous substances" was not sufficiently particularized in that the supporting affidavits indicated that "in order of probability, the drugs most likely to be found on the defendant's premises were: (1) heroin; (2) cocaine and (3) miscellaneous unknown substances." *Id.* at 577. In so deciding, this court relied on the Third Circuit's statement in *United States v. Christine*, 687 F.2d 749, 760 (3rd Cir.1982) that "the use of generic classifications in a warrant is acceptable when a more precise description is not feasible." This court suggested several alternative, more precise formulations for the description of items to be seized which would have given "far greater direction to the search": for example, "heroin, cocaine or other controlled dangerous substances" or "controlled dangerous substances, particularly heroin and cocaine." *Perez, supra* at 577. "Such descriptions would have ... markedly reduced the likelihood of an indiscriminate rummaging through defendant's personal effects." *Id.*

The court has reviewed the case law in this area and, upon reflection, believes that its holding in *Perez* was overly technical, and produced a harsh result which does not advance the purposes behind the Fourth Amendment. Accordingly, the court will no longer follow its holding in *Perez*. It concludes that in the instant case, the clause in the warrant, "controlled dangerous substances," gave sufficient direction to the executing officers, did not allow a general exploratory search and is not constitutionally defective. The motion by defendants Javier Sierra and Reynaldo Ojito to suppress the evidence seized pursuant to that clause will be denied.

I. *Statement of the Facts*

On August 8, 1983, Roy L. Clagg, Special Agent of the Drug Enforcement Agency (DEA) applied to the Honorable John W. Bissell, United States District Judge, for an authorization to intercept wire communications. In his supporting affidavit, Clagg detailed an investigation which focused on individuals suspected to be involved in the importation and distribution of cocaine. On August 8, 1983, Judge Bissell authorized the wiretap of certain telephone numbers and on September 7, 1983, the Honorable Dickinson R. Debevoise, United States District Judge, extended this authorization. On August 30, 1983, the Honorable Arthur J. Simpson, Jr., Judge of the Superior Court of New Jersey, Law Division, authorized interception of wire communications from certain telephone numbers, based on an affidavit submitted by Michael Gelchion, Investigator of the Hudson County Prosecutor's Office Strike Force.

On September 6, 1983, Gelchion submitted an affidavit detailing an outgoing call made by "Javier" from one of the wiretapped telephone numbers to a male identified as "Marica" at a telephone located at 1263 Valley Road, Apartment A, Wayne, New Jersey. Gelchion described the conversation as follows:

> Javier informed Marica that he was presently in possession of three little ones (meaning three ounces of controlled dangerous substances) and that there were babies left "there" (meaning at 1263 Valley Road). There were two (meaning two kilograms of controlled dangerous substances) at Valley Road. Javier stated that he left the controlled dangerous substances at Valley Road for Marica to inspect. Javier told Marica that he gave a male, identified as Juan, ten cents (meaning $10,000) for the controlled dangerous substances. The Affi-

ant's opinion is that the $10,000 is a down payment on the two kilograms of controlled dangerous substances.

Further in the conversation, Marica told Javier he is nervous about having the stuff (meaning controlled dangerous substances) at his house. Javier told Marica to put the stuff in his (Marica's) car.

Javier and Marica then discuss seeing the "Old Man" about the price of the controlled dangerous substances. They want to talk to the "Old Man" about paying 30 instead of 26. The Affiant's opinion is that the 30 is $30,000 and the 26 is $26,000 for the purchase price of one kilogram of cocaine.

Towards the end of the conversation, Marica told Javier that he (Marica) wanted Javier to remove the cocaine from his apartment and Javier agreed that he would make arrangements to do so.

Based on this affidavit the Honorable Joseph Hanrahan, Judge of the Superior Court of New Jersey, Law Division, issued a warrant on September 6, 1983 which authorized the seizure of the following items at the Valley Road apartment:

Controlled dangerous substances and adulterating and packaging material and equipment, storage containers, scales, measuring devices, telephone numbers, lists, books and records of drug stransactions [sic] and contraband money from drug transactions.

At approximately 12:00 noon, on September 6, 1983, police officers arrested Reynaldo Ojito on Route 46 in Northern New Jersey. They then drove him to his Valley Road apartment, which took about fifteen minutes, where they proceeded to execute the search warrant. In the apartment, they found three kilograms of cocaine. Other officers soon thereafter arrested Javier Sierra in Clifton, New Jersey.

On October 8, 1983, a federal grand jury returned a five-count indictment against Sierra, Ojito and three other individuals for possession with intent to distribute cocaine, conspiracy to distribute cocaine and use of a communication facility, a telephone, to facilitate this conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 843(b), 846, and 18 U.S.C. § 2. The three other defendants agreed to plead guilty and entered plea agreements in January, 1984.

Defendants Ojito and Sierra made the following motions to suppress certain evidence which the government might seek to introduce against them:

(1) to suppress evidence obtained from the wiretap authorization issued by Judge Bissell, and extended by Judge Debevoise, because the supporting affidavits failed to establish that the agents had exhausted normal investigative techniques;

(2) to suppress evidence obtained from the wiretap authorization issued by Judge Simpson, because it was not supported by probable cause;

(3) to suppress Ojito's post-arrest statements since he was allegedly not given his *Miranda* warnings; and

(4) to suppress evidence obtained pursuant to the search warrant issued by Judge Hanrahan because first, no probable cause existed, second, probable cause existed only to search Ojito's car and not the Valley Road apartment, and third, no probable cause existed for the items of drug paraphernalia listed in the warrant.

The government moved to challenge defendant Sierra's standing to challenge the search of the Valley Road apartment.

On March 19, 1984, the court read into the record its opinion denying defendants' motion to suppress evidence obtained pursuant to the wiretap authorizations. After the court heard testimony by an officer who testified he read Ojito his *Miranda* rights, Ojito withdrew his motion to suppress his post-arrest statements. The court also held that probable cause existed that drugs and drug paraphernalia would be found in the Valley Road apartment and that Sierra had standing to challenge the search of that apartment.

Presently before the court are two motions: defendants' motion to suppress evidence seized from the Valley Road apartment pursuant to the warrant's clause

"controlled dangerous substances" because the clause did not describe the items to be seized with sufficient particularity, and Sierra's motion to suppress his post-arrest statements because first, they were allegedly made involuntarily due to his panic disorder syndrome and, second, they were derived from the illegal search of the Valley Road apartment. For the reasons which follow, the court will deny defendants' motions.

## II. *Search of the Valley Road Apartment*

### A. *Probable Cause*

■ As the court found on March 19, 1984, the affidavits clearly revealed probable cause for both cocaine and controlled dangerous substances at the Valley Road apartment. *See* Gelchion affidavit of September 1, 1983 ¶ 4. Since defendants in this case often used code words and the agents had never seen the drugs—in contrast to *United States v. Morisse*, 660 F.2d 132 (5th Cir.1981), for example—the agents had probable cause to believe that drugs were in the apartment, but could not be certain that it was cocaine.

### B. *The "Particularity Requirement" of the Fourth Amendment*

In deciding whether the warrant's clause, "controlled dangerous substances," meets the Fourth Amendment's particularity requirement, the court must examine the purposes behind that requirement.

■ "[I]ndiscriminate searches and seizures conducted pursuant to general warrants, known in the colonies as writs of assistance, 'were the immediate evils that motivated the framing and adoption of the Fourth Amendment.' *Payton v. New York*, 445 U.S. 573, 583 [100 S.Ct. 1371, 1378, 63 L.Ed.2d 639] (1980)." *United States v. Christine*, 687 F.2d 749, 755 (3rd Cir.1982). In order to prevent general warrants—warrants that authorize "a general exploratory rummaging in a person's belongings" *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29

L.Ed.2d 564 (1971)—the Fourth Amendment requires all warrants to contain a "particular description" of the things to be seized. *Christine*, 687 F.2d at 752. "The particularity requirement 'makes general searches...impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' *Marron v. United States*, 275 U.S. 192, 196 [48 S.Ct. 74, 76, 72 L.Ed. 231] (1927)." *Id.* at 752–53. In *Christine*, the Third Circuit held that the warrant was not a general warrant "for it does not vest the executing officers with unbridled discretion to conduct an exploratory rummaging through appellees' papers in search of criminal evidence." *Id.* at 753.

■ In evaluating the particularity of the warrant at issue, the court must "avoid a hypertechnical approach by heeding the admonition that 'the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract.' *United States v. Ventresca*, 380 U.S. 102, 108 [85 S.Ct. 741, 745, 13 L.Ed.2d 684] (1965)." *Id.* at 760. "Affidavits and warrants 'must be tested by courts in a commonsense and realistic fashion.' *Ventresca*, 380 U.S. at 108 [85 S.Ct. at 745]. *See also United States v. Newman*, 685 F.2d 90, 92 (3rd Cir.1982). For instance, the use of generic classifications in a warrant is acceptable when a more precise description is not feasible. [citations omitted]." *Id.*

The Third Circuit has not yet ruled on whether the generic classification "controlled dangerous substances" is sufficiently particular to pass constitutional muster when there is probable cause for either (1) one particular drug or (2) one particular drug and unknown controlled dangerous substances. In *Perez*, this court held that if there was probable cause for a particular drug and other miscellaneous drugs, the warrant had to specify, for example, "cocaine and other controlled dangerous substances." After reviewing the case law, which contains Circuit Court decisions published after *Perez*, the court concludes, con-

trary to its holding in *Perez*, that "controlled dangerous substances" is sufficiently particularized when probable cause exists for both a particular drug and miscellaneous controlled dangerous substances.

Other courts have held that a generic term, such as "narcotics" or "drugs" was sufficiently particularized even when there was probable cause for only one particular drug.[1]

In *United States v. Cassidy*, 532 F.Supp. 613 (M.D.N.C.1982), *aff'd sub nom. United States v. Ladd*, 704 F.2d 134 (4th Cir.1983), the affidavit supporting the search warrant asserted that "a controlled substance, namely marijuana," was being concealed in a particular house. *Cassidy*, 532 F.Supp. at 614. The warrant authorized the search for and seizure of the following items:

> (1) property that constitutes evidence of the Commission of a criminal offense; or (2) contraband, the fruits of a crime or things otherwise criminally possessed; (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense; including but not limited to drug paraphernalia, items of identification, financial and business records, notations, items, instrumentalities and substances relating to the smuggling, packing, distribution and use of controlled substances.

*Id.* at 617. The defendant contended that this "did not describe the items to be seized with sufficient particularity" apparently because of the general description of clauses (1) and (2) above. *Id.* at 616.

The court rejected defendant's argument, finding "the warrant's description was general in part, [but] taken as a whole, the description was more than adequate to curb the discretion of the government agents, providing them with firm parameters as to what could lawfully be seized." *Id.* at 618. In reaching this conclusion, the court relied on *United States v. Fuller*, 441 F.2d 755 (4th Cir.1971), where the warrant authorized seizure of "booking records and wagering paraphernalia consisting of, but

not limited to, accounting sheets, rundown sheets, betting slips, recap sheets." *Id.* at 760. The Fourth Circuit found that this description was necessarily general, but the officer's authority was limited to the seizure of items relating to a booking operation. The Court held "that a warrant which is limited to the seizure of items which are directly related to a booking operation [is not] the kind of general search prohibited by the Fourth Amendment." *Fuller, supra* at 760.

In *Andresen v. Maryland*, 427 U.S. 463, 479 [96 S.Ct. 2737, 2748, 49 L.Ed.2d 627] (1976), the Supreme Court upheld a search where items were seized pursuant to a search warrant authorizing seizure of specific documents "together with fruits, instrumentalities and evidence of crime at [this] time unknown." The Court found that read in context, the warrant limited the authorized seizure to evidence of one particular offense, and the above-quoted phrase did not invalidate the warrant.

*Cassidy, supra* at 618. The District Court in *Cassidy* found that "the warrant confined the seizable items to those related to the crime of smuggling, distributing, and using controlled substances. Such specificity passes constitutional muster." *Id.* at 619. Although all the evidence in that case related to one particular drug, marijuana, the court held that the term "controlled dangerous substances" was sufficiently particularized.

On appeal, the defendant again asserted that the warrant violated the particularity requirement. The Fourth Circuit found this argument unpersuasive, stating:

> The instant warrant fully satisfies the particularity requirement. The items to be seized were limited to those relating to "the smuggling, packing, distribution and use of controlled substances." More specificity is not required by the Constitution.

704 F.2d at 136.

In *United States v. Rubio*, 526 F.Supp. 171 (S.D.N.Y.1981), *aff'd*, 709 F.2d 146 (2nd Cir.1983), the affidavit supporting the war-

---

**1.** This case does not present that issue and the court does not need to reach it.

rant asserted that the defendants agreed to purchase cocaine and one of the defendants told the agent they had smuggled cocaine on previous occasions. The affidavit also recited the evidence seized incident to defendants' arrest, which included a kit for testing cocaine and two "dime" bags of heroin. 526 F.Supp. at 176. Based on this information, the warrant authorized a search for:

> narcotics and other drugs, drug paraphernalia, customer lists, monies, weapons and ammunition, safety deposit records and keys, false passports and other false identification, and other records, documents and papers which constitute evidence of a conspiracy to illegally possess and distribute narcotics and dangerous drugs, which is being carried out in violation of Title 21, United States Code, Sections 841 and 846.

*Id.* at 175–76. The defendants alleged that the warrant was unduly ambiguous in using such phrases as "other drugs." The district court disagreed:

> When reading the warrant in a common sense fashion, *United States v. Ventresca,* 380 U.S. 102, 109 [85 S.Ct. 741, 746, 13 L.Ed.2d 684] (1965) however, it is clear that the clauses are sufficiently specific in light of the general knowledge of the DEA agents and the virtual impossibility of more exact descriptions.

*Id.* at 176. In effect, the court held that although the undercover agents had knowledge of both cocaine and heroin, a more exact description than "narcotics and other drugs" was not constitutionally required. The court did not require the warrant to say "cocaine and heroin," or "cocaine, heroin and other narcotics." The court further commented:

> Defendants' reading of the "other drugs" clause is out of context. When the warrant is read as a whole, it becomes obvious that only contraband evidencing a drug conspiracy was sought. An indiscriminate seizure of all drugs in defendants' home was not authorized. The remaining contested clauses reflect the general nature of defendant Rosado's assertions to Agent Castillo during the negotiation stages. The restrictive lan-

guage of the warrant ensured that the scope of the warrant was limited to evidence connected to this drug trafficking charge.

*Id.* Since the search would be limited to the drug trafficking charge—although not just limited to heroin and cocaine—the warrant was sufficiently particularized. This decision was affirmed on appeal without an opinion. *United States v. Rubio,* 709 F.2d 146 (2nd Cir.1983).

In *United States v. Morisse,* 660 F.2d 132 (5th Cir.1981), the affidavit recited negotiations between the defendant and an undercover agent for the purchase of cocaine but did not provide information regarding any other drug. *Id.* at 134–35. Based on this affidavit, the warrant permitted the search and seizure of "drug trafficking paraphernalia, records, money and other evidence of drug trafficking." *Id.* at 136.

The defendant maintained that this was an invalid general warrant. The court disagreed, finding that this was not a general warrant. In so finding, it said:

> The affidavit provided probable cause to suspect a drug distribution scheme and the warrant limited the search and seizure to paraphernalia, records, and money connected with the alleged drug-related crimes. "When circumstances make an exact description of instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking." *James v. United States,* 416 F.2d 467, 473 (5th Cir.1969); *Spinelli v. United States,* 382 F.2d 871 (8th Cir. 1967) reversed on other grounds), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Calo v. United States,* 338 F.2d 793 (1st Cir.1964). The items to be seized were as precisely identified as the nature of the activity permitted. As a result, the warrant was not global.

*Id.* In so finding, the court did not require a more particularized list of the drugs to be seized even though the undercover agent had actually seen the cocaine. It found that a generic classification of "drug trafficking" sufficient although all the evi-

dence pointed to "cocaine trafficking." The court made further observations about the problem with a generic classification as opposed to a more particularized description. It stated:

> We note that this case does not raise the problem of a generic description that conceivably would allow law enforcement agents to seize legal items. The nature of drug trafficking is such that illegal paraphernalia is readily distinguishable from legal items. We can conceive of certain illegal activities in which the nature of the activity does not allow for such ready segregation. In those cases, the magistrate should take care to assure the warrant informs the law enforcement agent as to how he should distinguish between illegal paraphernalia and items that are held legally.

*Id.* at n. 1. In other words, one of the major problems with a generic description is that an officer executing the warrant might seize legal items in addition to the contraband. In the case of drugs, this potential does not exist as they are "readily distinguishable" from legal items.

For this reason, the Supreme Court has implied that "a less exacting standard of specificity may be applied to the description of contraband." *United States v. Johnson,* 690 F.2d 60, 67 (3rd Cir.1982) (Bloch, J., Dissenting), citing *Stanford v. Texas,* 379 U.S. 476, 486, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965); *Steele v. United States No. 1,* 267 U.S. 498, 504, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925); and *Marcus v. Search Warrant,* 367 U.S. 717, 731, 81 S.Ct. 1708, 1715, 6 L.Ed.2d 1127 (1961).

In the present case, the court finds that "controlled dangerous substances" meets the particularity requirement of the Fourth Amendment. The purpose of this requirement is to prevent a general rummaging through an individual's belongings. By limiting the search to evidence of a specific crime—drug trafficking—this warrant will give guidance to the officer's search and prevent a general rummaging through an individual's belongings. Since an officer could legitimately search in all the same places whether a warrant specifies a search for "cocaine and controlled dangerous sub-

stances" or just "controlled dangerous substances," the clause "cocaine and controlled dangerous substances" does not focus the search nor "markedly reduce[ ] the likelihood of an indiscriminate rummaging through defendant's personal effects." *Perez,* 562 F.Supp. at 577.

In a case presenting an almost identical fact pattern as the instant case, the Honorable John F. Gerry, United States District Judge, found that the phrase, "controlled dangerous substances" met the particularity requirement of the Fourth Amendment. *United States v. John Tehfe, et al.,* Crim. No. 83–37 (D.N.J. June 8, 1983) (unpublished opinion). He commented,

> Whether the search warrant particularly specified "cocaine" and "heroin" or simply specified "controlled dangerous substances" would have no effect upon the *scope* of the search of defendant's property. Law enforcement officers searching the premises for "heroin" or "cocaine" would certainly make an extensive search of the area: drugs can be hidden almost anywhere. [emphasis in original].

*Id.* at 5.

While it is true that a warrant must be as particularized as the facts permit, this command must be interpreted in a common sense fashion and cannot be carried to an absurd extreme. In deciding what is a hypertechnical interpretation of a warrant, the court must be guided by the Fourth Amendment's purposes. Since the warrant as presently drawn prevents an exploratory search, does not as a practical matter allow a broader search than one permissible under the clause "cocaine and controlled dangerous substances," limits the search to evidence of a single crime, and does not allow the seizure of legal items, as they are readily distinguishable from contraband, the court will not strike the clause "controlled dangerous substances" and evidence seized pursuant to this clause will be admissible.

### III. *The Voluntariness of Sierra's Post-Arrest Statements*

Defendant Sierra moves to suppress his post-arrest statements and confession

made to investigating officers on the ground that they were not voluntarily made as he did not knowingly and intelligently waive his Miranda rights since he was suffering from a so-called "panic attack." For the reasons which follow, the court will deny defendant's motion.

■ A voluntary confession does not violate a defendant's due process rights. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). For a confession to be voluntary, it must be the "product of an essentially free and unconstrained choice." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961); *United States v. Dickens,* 695 F.2d 765, 778 (3rd Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983). To determine whether a confession meets this standard the court must examine the

> totality of all the circumstances—both the characteristics of the accused and the details of the investigation. Some of the factors taken into account have been the youth of the accused, ... his lack of education, ... or his low intelligence, ... the lack of any advice to the accused of his constitutional rights, ... the length of detention, ... the repeated and prolonged nature of the questioning ... and the use of physical punishment such as the deprivation of food or sleep ... [citations omitted].

*Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). None of the Supreme Court's decisions have "turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances." *Id.* Nevertheless, statements made during a time of mental incompetency or insanity are involuntary and consequently inadmissible. *Blackburn v. State,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). A court must "take into account a defendant's mental limitations, to determine whether through susceptibility to surrounding pressure or inability to comprehend the circumstances, the confession was not a product of his own free will." *Jurek v. Estelle,* 623 F.2d 929, 937 (5th Cir.1980) (en banc), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). "A fundamental concern is a mentally deficient accused's vulnerability to suggestion." *Henry v. Dees,* 658 F.2d 406 (5th Cir.1981).

At an evidentiary hearing held on March 19, 1984, Sierra offered his testimony and that of Dr. Waldo Pardo, a psychiatrist who had treated Sierra on several occasions. Sierra testified that at the time he was arrested, his head and heart were "going very fast" and he experienced pressure in his chest and back of his head. Dr. Pardo testified that Sierra suffered from panic disorder syndrome (PDS). If an individual with this syndrome were suffering a so-called "panic attack," the symptoms might include chest pains, numbness, palpitations and imminent sensations of death. The individual undergoing an attack would focus on ways to relieve this anxiety, and would not be able to think in a rational and calm manner.

■ In opposition to defendant's motion, the government offered the testimony of Dr. Steven S. Simring, a psychiatrist who interviewed Sierra for several hours, reviewed all of Sierra's medical records, including Pardo's affidavit, and a report of defendant's arrest. Simring concluded that defendant suffered from a somatization disorder, which is a diagnosis compatible with that given by Pardo. Simring testified that neither PDS nor a somatization disorder constituted a thinking disorder and would be classified in layman's terms as a neurosis. Defendant did not suffer from delusional thinking and had no impairment of reality. After questioning defendant extensively about his account of the arrest, Simring concluded that defendant was neither particularly suggestible at the time of his arrest nor during the interview in Simring's office. Defendant had a clear understanding of the DEA Agent's questions and the events surrounding his arrest.

After considering the testimony and all the facts and circumstances surrounding his arrest, the court concludes that defendant Sierra's statements were not involuntarily made and that he knowingly and intelligently waived his *Miranda* rights.

First, there was no evidence that Sierra had a "panic attack" at the time of his arrest. In his testimony, he never asserted that he underwent a panic attack during his arrest, but only that his head and heart were "going very fast," and that he experienced pressure in his chest and back of his neck. He testified that his mental state and level of nervousness at the time of his arrest were comparable to what he was presently experiencing in court.

The court observes that Sierra while on the stand was an individual of at least average intelligence who comprehended all the questions asked of him by his counsel and by the Assistant United States Attorney. The nervousness that he exhibited on the stand was no more than that of an average witness and it clearly did not interfere with his ability to intelligently answer questions. Rather than being suggestible, Sierra exhibited an independent thought process. He rejected answers suggested to him on direct examination and cross-examination. For example, when his counsel asked him whether he experienced any pain at the time of his arrest, he responded that he did not experience pain, but only pressure. When his counsel asked him whether he felt dizzy in court, he testified that he did not. In short, defendant answered affirmatively to some questions, negatively to other questions and for still other questions, responded that he could not remember events or did not know the answer. Nothing in defendant's testimony indicated that he was particularly susceptible to suggestion in court or when he was originally questioned by DEA Agents.

■ Sierra's testimony that his head and heart were going fast at the time of arrest, as in court, is consistent with his testimony that he was scared on both occasions. This would be natural from the importance of both situations. Fear alone would certainly not make these statements involuntary as that would render inadmissible almost every statement given by a defendant.

Second, both Dr. Pardo and Dr. Simring agreed that defendant did not have a "thinking disorder," in that his ailment, no matter how it is characterized, did not impair his ability to control his own thought processes. Although Pardo testified that it would be more likely that the stressful situation of an arrest would cause a panic attack, Simring asserted that a salient feature of panic attacks is that they may be triggered without external stress and arise "out of the blue." In any case, Pardo did not testify that Sierra had a panic attack at the time of his arrest, and he admitted that he had no information regarding defendant's physical ailments on the day of his arrest, or any other information regarding his arrest. In fact, the last time Pardo saw defendant was on May 19, 1983, almost four months before his arrest.

Third, the court's conclusion that defendant's mental state at the time of his arrest was not so impaired as to render his statements involuntary is confirmed by the testimony of DEA Agent Victor Pedalino. After defendant was advised of his rights, Pedalino interviewed him regarding the cocaine. Pedalino, who has conducted two hundred to three hundred post-arrest interviews testified that he would evaluate Sierra's "demeanor" as average. Although Pedalino has terminated post-arrest interviews when an individual becomes too emotional, he testified that Sierra did not fall into that category.

Fourth, defendant's argument that he was inordinately suggestible at the time of his arrest is not credible as it was defendant himself who provided the name and address of his cocaine supplier to Agent Pedalino. No name or address was suggested to him. Other aspects of defendant's statements to the Agent following his arrest were likewise not the product of suggestion but provided in the first instance by defendant. Dr. Simring, whom this court found to be a most credible and articulate witness, also concluded that defendant was suggestible neither during his interviews with him or Agent Pedalino.

Fifth, Sierra was only detained briefly before police questioning began, and there were absolutely no threats of violence or physical abuse.

Accordingly, the court will deny defendant Sierra's motion to strike his post-arrest statements as involuntarily given.

IV.  *Suppression of Sierra's Post-Arrest Statements as Tainted by the Allegedly Illegal Search of the Wayne Apartment*

Defendant Sierra moves to suppress his post-arrest statements since they were tainted by the allegedly illegal search of the Wayne apartment.

Since the court has already concluded that the search of the Wayne apartment was conducted pursuant to a valid warrant, the court will deny defendant's motion.

V.  *An order incorporating the foregoing shall be entered.*